IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| Barry F. Shesol, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 06-CV-02551-JLK-CBS |
| | ) |
| I.V. House, Inc., a Missouri Corporation, | ) Honorable John L. Kane |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

MEMORANDUM IN SUPPORT OF I.V. HOUSE'S
MOTION TO DISMISS FOR IMPROPER VENUE
OR, ALTERNATIVELY, MOTION TO TRANSFER VENUE

Defendant, I.V. House, Inc., ("I.V. House") has moved for an order to dismiss this action

under 28 U.S.C. § 1406(a) and Federal Rule of Civil Procedure 12(b)(3) or, alternatively, to

transfer this action under 28 U.S.C. § 1404(a) to the United States District Court for the Eastern

District of Missouri, where it can be marked as related to or consolidated with another case

between these same parties, *I.V. House, Inc., et al. v. Shesol,* Civil Action No. 07-CV-272 (E.D.

Mo., filed February 6, 2007).

As demonstrated below, there is no reason for this action to remain pending in this Court.

## I.    INTRODUCTION

The Plaintiff, Barry F. Shesol, M.D. ("Shesol"), commenced this action against I.V.

House, a Missouri corporation having its principal place of business in St. Louis, Missouri,

alleging that Shesol should be named as an inventor on U.S. Patent No. 6,526,981 ("the '981

Patent"), and seeking damages from I.V. House on theories of quasi-contract, implied contract, and breach of a confidential relationship. The '981 Patent is owned by I.V. House and names Betty Rozier and Lisa Vallino, both of whom are owners of I.V. House, as inventors.

Shesol filed this action in this Court, despite the fact that in August of 1999, he agreed that any dispute between the present parties shall be governed by Missouri law and heard in the Eastern District of Missouri. In addition to Shesol's agreement that the Eastern District of Missouri is the proper place for the parties to litigate their dispute, venue is not proper in this Court under the traditional venue analysis. Accordingly, this case should be dismissed pursuant to 28 U.S.C. § 1406(a).

Further, even if venue is proper here, the interest of justice weighs in favor of a transfer of this action to the Eastern District of Missouri. Specifically, this case should be transferred to the Eastern District of Missouri pursuant to 28 U.S.C. § 1404(a) because (1) this action could have been brought in the Eastern District of Missouri, (2) Missouri has a significant connection with the events alleged in Shesol's complaint, and (3) the majority of the witnesses and documentary evidence are located in the Eastern District of Missouri.

## II.    FACTS

### A.    The Parties and the Events Leading up to Shesol's Allegations

According to his own Complaint, Shesol resides in the State of Colorado while I.V. House is a Missouri corporation, having a principal place of business at 7400 Foxmont Drive, St. Louis, Missouri 63042. (Complaint, ¶ ¶ 4, 6).

13371397

I.V. House was founded in 1991 by Betty Rozier and her daughter, Lisa Vallino, R.N. Ms. Rozier is the president of I.V. House and Ms. Vallino is its Vice-President and Clinical Director.  Currently, I.V. House has only one employee.  (Exhibit 1, Rozier Decl., ¶ 3).

I.V. House is engaged in the development, manufacture, and sale of medical device products, and specifically intravenous ("I.V.") site protective coverings ("site guards").  The I.V. HOUSE® brand of I.V. site guards was first conceived by Ms. Vallino while she was an emergency room nurse at Cardinal Glennon Children's Hospital, located in St. Louis, Missouri, in the early 1990s.  The I.V. HOUSE® brand site guards obtained patent protection in the United States and abroad, and received approval as a Class I Medical Device from the United States Food and Drug Administration.  (Exhibit 1, Rozier Decl., ¶ 6).

The I.V. House product is covered by the claims of U.S. Patent No. 5,167,240 and U.S. Design Patent No. 335,926.  When that product was introduced into the market, it received numerous awards and national recognition.  For example, I.V. House received the Award for Exceptional Creativity from the Intellectual Property Owners and the United States Patent and Trademark Exposition in 1994, received national recognition in the Journal of IV Nursing in 1996, and was nominated for the 1997 Lemelson MIT Prize.  (Exhibit 2).

Between 1993-1999, Ms. Rozier and Ms. Vallino conceived of new variations for the I.V. House site guards, including, but not limited to, a site guard that could be secured to a patient without the use of any adhesives.  Certain of these improvements led to the issuance of the '981 Patent.  This is the '981 Patent concerning which Shesol alleges that he is a co-inventor.  (Complaint ¶ 26).

3

13371397

In August 1999, Shesol contacted I.V. House through a letter addressed to its Missouri office in which he stated that he had seen the I.V. HOUSE® brand site guard in a trade magazine. Shesol explained that he had a series of dressings that he believed might work well in combination with I.V. House's product. He further suggested that the parties discuss the possibility of entering into a joint venture for combining the two products. (Rozier Decl., ¶ 8; *see also* Exhibit 3).

In response to Shesol's letter, on or about August 24, 1999, Ms. Rozier sent Shesol a Confidential Disclosure Agreement (the "CDA"). (Rozier Decl., ¶ 9; *see also* Exhibit 4). The CDA contained a choice of law/forum selection provision, which provides, in relevant part, that "[a]ny dispute arising under this Agreement shall by governed by the laws of the State of Missouri…[and] shall only be brought in a court of competent jurisdiction in the City and/or County of St. Louis, Missouri, U.S.A." *(Id.).* Ms. Rozier sent the CDA before providing any substantive response to Shesol's letter because I.V. House wanted to maintain the confidentiality and secrecy of its propriety information. (Exhibit 1, Rozier Decl., ¶ 9).

On or about August 24, 1999, Shesol executed the CDA on behalf of himself and Tapeless Technologies, Inc. ("Tapeless"). I.V. House has been under the impression that at all times, Shesol was the president of Tapeless and that he currently is a successor and/or assign of Tapeless.

Between September 1999 and March 2000, I.V. House corresponded with Shesol regarding the development of a new product, which combined I.V. House's site guard with Shesol's dressings. In addition, I.V. House created various prototypes of the new product, and

disclosed its proprietary and confidential information to Shesol pursuant to the CDA that he had signed. All of I.V. House's actions occurred in St. Louis, Missouri. (Exhibit 1, Rozier Decl., ¶ 11). I.V. House never traveled to Colorado in relation to any matter involving Shesol. *(Id.)*. Moreover, I.V. House has never (i) owned property in Colorado, (ii) maintained an office in Colorado, (iii) maintained a telephone listing in Colorado, (iv) maintained a bank account in Colorado, or (v) employed sales representatives in Colorado. And, although some I.V. House products are sold in Colorado, either directly by I.V. House or through a distributor, those sales have represented only about 1% of I.V. House's annual sales. (Exhibit 1, Rozier Decl., ¶ 12). In addition, no I.V. House product covered by the claims of the '981 Patent have been sold in Colorado. *(Id.)*.

In contrast, John Finamore, the Chief Executive Officer of Tapeless, visited the I.V. House office in St. Louis in March 2000 for the purpose of negotiating a joint development agreement between the parties. (Exhibit 1, Rozier Decl., ¶ 13). I.V. House had no further communications with Shesol or Tapeless after May 2000. *(Id.)*.

## B.    The Current Action

Although there had been no contact between the parties for a number of years, Shesol has now resurfaced and filed suit against I.V. House alleging that as a result of his discussions with I.V. House, which were governed by the terms of the CDA, he should be named as an inventor on the '981 Patent. Shesol also seeks damages from I.V. House on theories of quasi-contract, implied contract, and breach of a confidential relationship.

13371397

## III.   ARGUMENT

### A.   This Action Should be Dismissed Under 28 U.S.C. § 1406(a)

28 U.S.C. § 1406(a) provides that the "district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." In this case, venue is not proper because this Court does not have personal jurisdiction over I.V. House.

> The Colorado long-arm statute provides, in relevant part, that:
>
> [e]ngaging in any act enumerated in this section by any person, whether or not a resident of the state of Colorado, either in person or by an agent, submits such person and, if a natural person, such person's personal representative to the jurisdiction of the courts of this state concerning any cause of action arising from: (a) [t]he transaction of any business within this state…

C.R.S. § 13-1-124 (2006). In applying its long-arm statute, this Court has followed the standard set forth in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), "for determining whether or not the assertion of personal jurisdiction is consistent with due process." *Automated Quill, Inc. v. Chernow*, 455 F. Supp. 428, 429 (D. Colo. 1978). Specifically, this Court has held that "[d]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *(Id.).* (quoting *International Shoe*, 326 U.S. at 316).

This Court has also held that the question of what constitutes the transaction of any business must be decided on the facts of the case at hand. *Elliott v. Edwards Eng'g Corp.*, 257 F. Supp. 537, 538 (D. Colo. 1965). Some facts that the court considers are whether the entity has a

13371397

representative in the state; advertises in the telephone book; the quantity of business transacted in the state; and whether the product to which the claim arises was sold in the state. (Exhibit 1, Rozier Decl., ¶ 12).

In this case, the standard for "minimum contacts" is not met. I.V. House does not (i) have an office in Colorado; (ii) have a representative in Colorado; (iii) advertise or promote its products in Colorado; (iv) have a telephone listing in Colorado; or (v) maintain a bank account in Colorado. *(Id.)*. Further, only about 1% of I.V. House's total annual sales originate in Colorado; and no I.V. House products covered by the claims of the '981 Patent have been sold in Colorado. Under the *International Shoe* test, I.V. House has not had the minimum contacts with Colorado necessary to support personal jurisdiction. This case should therefore be dismissed under 28 U.S.C. § 1406(a) for improper venue.

**B.      Alternatively, this Action Should be Transferred Under 28 U.S.C. § 1404(a)**

If the Court does not dismiss this case outright, I.V. House submits that the case should be transferred under 28 U.S.C. § 1404(a). That section provides that for "the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Thus, Section 1404(a) affords the district court the discretion "to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Wolf, et al. v. Gerhard Interiors, Ltd., et al.*, 399 F. Supp. 2d 1164, 1166 (D. Colo. 2005) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

13371397

The party moving for the transfer bears the burden of establishing that (1) the action could have been brought in the alternate forum, (2) the existing forum is inconvenient, and (3) the interests of justice are better served in the alternate forum. *Wolf*, 399 F. Supp. 2d at 1166. *See also Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1515 (10th Cir. 1991). As discussed below, all three of these factors weigh in favor of a transfer of this case to the Eastern District of Missouri.

1.    The Action Could Have Been Brought in the Eastern District of Missouri

Section 1404(a) requires that the transferee venue be a district "where [the action] might have been brought." 28 U.S.C. § 1404(a). In this case, I.V. House is a Missouri corporation with its only office located in St. Louis, Missouri. Thus, I.V. House is subject to the general jurisdiction of Missouri and Shesol could have brought this action in the Eastern District of Missouri. This factor thus weighs in favor of a transfer of this case to the Eastern District of Missouri.

In fact, all parties agreed that Missouri was the best forum to resolve their differences. Shesol agreed that any dispute arising under the CDA will be governed by Missouri law and heard in St. Louis. "Forum selection clauses are *prima facie* valid and a party contesting that presumption bears a heavy burden of proof." *Barton v. Key Gas Corp.*, No. 05-cv-01856-REB-PAC, 2006 WL 2781592, at * 2 (D. Colo. Sept. 26, 2006). Consequently, this court should adhere to the parties' agreement and transfer this case.

Although we anticipate that Shesol will contend that another separate confidentiality agreement between the parties should control venue in this action, because it specifies that

13371397

disputes under it are to be heard here, that position would be incorrect.  The federal question

subject matter of *this* suit is the correct inventorship of I.V. House's '981 Patent.  Any answer to

that question necessarily implicates the nature and extent of information disclosed under, and

disputes concerning, the earlier CDA that places venue squarely in the Eastern District of

Missouri.

### 2. The District of Colorado is an Inconvenient Forum

When considering if a forum is inconvenient, a court considers a number of factors, such

as:

> [p]laintiffs' choice of forum; accessibility of witnesses and other sources of proof,
> including availability of compulsory process to insure attendance of witnesses;
> cost of making necessary proof; questions as to enforceability of judgment if one
> is obtained; relative advantages and obstacles to fair trial; difficulties that may
> arise from congested dockets; the possibility of existence of questions arising in
> area of conflicts of laws; the advantage of having local court determine questions
> of local law; and, all other considerations of a practical nature that make a trial
> easy, expeditious, and economical.

*Chrysler*, 928 F.2d at 1516.  Further, although a plaintiff's choice of forum is generally afforded

considerable weight, a plaintiff's choice of forum is not determinative when the balance of

considerations weigh in defendant's favor.  *McMechen v. United States*, No. 06-cv-02209-LTB-

MEH, 2007 WL 433123, at * 2 (D. Colo. Feb. 2, 2007).  Here, forum is the only factor favoring

Shesol.  Consequently, the balance of considerations weigh in I.V. House's favor.

### a. Convenience of the Witnesses

It has long been recognized that the convenience of the witnesses is often the most

important factor for a court to consider when deciding on a motion to transfer.  *Sackett v. Denver*

*& Rio Grande Western Railroad Co.*, 603 F. Supp. 260, 261 (D. Colo. 1985).

In this case, none of the witnesses that I.V. House expects would testify (the "I.V. House Witnesses") resides in Colorado. (Exhibit 1, Rozier Decl., ¶ 14). Rather, the I.V. House Witnesses reside in Missouri. *(Id.)*. These witnesses include, but are not limited to: Betty Rozier and Lisa Vallino, co-owners of I.V. House; Lisa Rene Rozier, I.V. House's sole employee; Eileen Constantinou, a Nursing Practice Consultant at Barnes Hospital in Missouri, and Darnell Roth who are not employees of I.V. House and who would not be subject to this Court's subpoena power. *(Id.)*. These witnesses have knowledge concerning the conception and development of the invention disclosed and claimed in the '981 Patent, and/or the communications between Shesol and I.V. House. In addition, Ms. Roth has a terminal illness that would likely prohibit her from traveling to Colorado. *(Id.)*. Consequently, numerous people, including non-parties, would be inconvenienced if this action was allowed to proceed in this Court.

In contrast, Shesol appears to be the only Colorado resident who would have to travel to Missouri. When this fact is weighed against the number of I.V. House Witnesses that would have to travel to Colorado, this factor weighs heavily in favor of a transfer to the Eastern District of Missouri.

b. <u>Documentary Evidence</u>

I.V. House's paper documents, files, machinery and all of its prototypes are located in St. Louis, Missouri. All of I.V. House's conception, design, and development activities relating to the '981 Patent and the patented product also occurred in Missouri. These documents and activities are integral to this action as they establish the conception and development of the

invention disclosed and claimed in the '981 Patent. (Exhibit 1, Rozier Decl., ¶ 15). Further, I.V. House believes that the volume and medium of the materials to be transported to Colorado would make this case more expensive if it were to remain in this Court. *(Id.)*. Accordingly, this factor weighs in favor of a transfer to the Eastern District of Missouri.

### c.      Cost of Making the Necessary Proof

As discussed above, if this action remains with this Court, numerous witnesses and a large volume of documentary evidence will need to be transported to Colorado. This will be a severe burden for I.V. House, which has sales of under one million dollars per year. *(Id.)*. Therefore, this factor weighs in favor of a transfer to the Eastern District of Missouri.

### d.      Case Disposition

As of September 30, 2006, the District of Colorado had more cases pending per judge – 370 cases versus 311 cases – than the Eastern District of Missouri. *See* Judicial Caseload Profile Report at http://www.uscourts.gov. In addition, the District of Colorado had a longer median time from filing to trial – 32 months versus 21.5 months – than the Eastern District of Missouri. *Id.* Because the docket in the Eastern District of Missouri is less congested than the docket in the District of Colorado, this factor also weighs in favor of a transfer to the Eastern District of Missouri.

### 3.      The Interests of Justice are Better Served in the Eastern District of Missouri

Section 1404(a) provides, in relevant part, that a district court may transfer any civil action "in the interest of justice." 28 U.S.C. § 1404(a). In this case, the interest of justice will be better served if this action is transferred to the Eastern District of Missouri.

13371397

First, this case involves the patent rights of a citizen of Missouri and that state has an interest in ensuring that the rights of its citizens are fully considered.

Second, Shesol's complaint has not provided any nexus between his claims against I.V. House and Colorado. Indeed, Shesol fails to even allege that any substantive acts occurred in Colorado, or that any witnesses or evidence can be found in Colorado. The overwhelming evidence shows that the substantive acts involved in this case occurred in Missouri. Shesol initially contacted I.V. House in Missouri; a representative of his company traveled to Missouri to negotiate an agreement with I.V. House; I.V. House is a Missouri corporation with its only office located in Missouri; the actions giving rise to the complaint occurred in Missouri; the witnesses reside in Missouri; and the documents are located in Missouri. Indeed, Shesol's agreement to have disputes heard in Missouri underscores that the Missouri Court is the appropriate forum.

Thus, justice requires that Shesol be bound to his obligations under the CDA and that this case be heard in the Eastern District of Missouri where the events giving rise to the complaint occurred.

## IV.   CONCLUSION

Given the overwhelming connections to the Eastern District of Missouri, and the lack of any connection to the District of Colorado, I.V. House respectfully requests that this Court grant its motion to dismiss for lack of venue pursuant to 28 U.S.C. § 1406(a) or, alternatively, to transfer this action pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Eastern District of Missouri.

13371397

Dated: March 9, 2007

Respectfully submitted,

I.V. HOUSE, INC.

By:  /s/ Joseph A. Mahoney
                    One of Its Attorneys

Joseph A. Mahoney
Donald W. Rupert
Vera A. Nackovic
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, IL  60606-4637
Telephone:      (312) 782-0600
Facsimile:       (312) 701-7711

13371397

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| Barry F. Shesol, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Case No.  06-CV-02551-JLK-CBS** |
| | ) |
| I.V. House, Inc., a Missouri Corporation, | ) **Honorable John L. Kane** |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

## CERTIFICATE OF CONFERENCE

I hereby certify that I have conferred with J. Mark Smith, counsel for Plaintiff, Barry F. Shesol, M.D., and at this time we were unable to reach an agreement on the relief sought in this Motion.

*/s/Joseph A. Mahoney*

13371397

EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| **Barry F. Shesol, M.D.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Case No.  06-CV-02551-JLK-CBS** |
| | ) |
| **I.V. House, Inc., a Missouri Corporation,** | ) **Honorable John L. Kane** |
| | ) |
| **Defendant.** | ) |
| | ) |
| | ) |

## DECLARATION OF BETTY ROZIER

I, Betty Rozier, state as follows:

1.     I am the President of I.V. House and make this declaration based on my personal knowledge.

2.     I.V. House, Inc. ("I.V. House") is a Missouri Corporation, having a principal place of business at 7400 Foxmont Drive, St. Louis, Missouri 63042.  I.V. House does not maintain any offices outside of Missouri.

3.     I.V. House was founded in 1991 by me and my daughter, Lisa Vallino, R.N.  As noted, I am the President of I.V. House and Ms. Vallino is its Vice-President and Clinical Director. Currently, I.V. House has only one employee, Lisa Rene Rozier.

4.     All of I.V. House's products are manufactured in Missouri.  In addition, all of I.V. House's packaging and marketing materials are created and printed in Missouri.

5.     I.V. House is a small company, with annual sales under one million dollars a year.

13371675

6.      I.V. House is engaged in the development, manufacture, and sale of medical device products, and specifically intravenous ("I.V.") site protective coverings ("site guards"). The I.V. HOUSE® brand of IV site guards was first conceived by Ms. Vallino while she was an emergency room nurse at Cardinal Glennon Children's Hospital, located in St. Louis, Missouri, in the early 1990s. The I.V. HOUSE® brand site guards obtained patent protection in the United States and abroad, and received approval as a Class I Medical Device from the United States Food and Drug Administration.

7.      The I.V. House product is covered by the claims of U.S. Patent No. 5,167,240 and U.S. Design Patent No. 335,926. When that product was introduced into the market, it received numerous awards and national recognition. For example, I.V. House received the Award for Exceptional Creativity from the Intellectual Property Owners and the United States Patent and Trademark Exposition in 1994, received national recognition in the Journal of IV Nursing in 1996, and was nominated for the 1997 Lemelson MIT Prize. (Exhibit 2).

8.      In August 1999, Barry F. Shesol, M.D. ("Shesol") contacted I.V. House through a letter addressed to our Missouri office in which he stated that he had seen the I.V. HOUSE® brand site guard in a trade magazine. A true and correct copy of the letter is attached to Defendant's Memorandum in Support of I.V. House's Motion to Dismiss for Improper Venue or Alternatively, Motion to Transfer Venue as Exhibit 3. Shesol explained that he had a series of dressings that he believed might work well in combination with I.V. House's product. He further suggested that the parties discuss the possibility of entering into a joint venture for combining the two products.

9.      In response to Shesol's letter, on or about August 24, 1999, I sent Shesol a Confidential

Disclosure Agreement (the "CDA").    A true and correct copy of the CDA is attached to

Defendant's Memorandum in Support of I.V. House's Motion to Dismiss for Improper Venue or

Alternatively, Motion to Transfer Venue as Exhibit 4.    The CDA contained a choice of

law/forum selection provision, which provides, in relevant part, that "[a]ny dispute arising under

this Agreement shall by governed by the laws of the State of Missouri…[and] shall only be

brought in a court of competent jurisdiction in the City and/or County of St. Louis, Missouri,

U.S.A." I sent the CDA to Shesol before providing any substantive response to his letter because

I wanted to maintain the confidentiality and secrecy of I.V. House's propriety information.

10.     On or about August 24, 1999, Shesol executed the CDA on behalf of himself and

Tapeless Technologies, Inc. ("Tapeless").  I.V. House has been under the impression that at all

times, Shesol was the president of Tapeless and that he currently is a successor and/or assign of

Tapeless.

11.     Between September 1999 and March 2000, I.V. House corresponded with Shesol

regarding the development of a new product which combined I.V. House's site guard with

Shesol's dressings.  In addition, I.V. House created various prototypes of the new product, and

disclosed its proprietary and confidential information to Shesol pursuant to the CDA that he had

signed.  All of I.V. House's actions occurred in St. Louis, Missouri.  No representative of I.V.

House ever traveled to Colorado in relation to any matter involving Shesol.

12.     Moreover, I.V. House has never (i) owned property in Colorado, (ii) maintained an office

in Colorado, (iii) maintained a telephone listing in Colorado, (iv) maintained a bank account in

Colorado, or (v) employed sales representatives in Colorado. And, although some I.V. House products are sold in Colorado, either directly by I.V. House or through our distributor, Cardinal Health, those sales have represented only about 1% of I.V. House's annual sales. In addition, no I.V. House product covered by the claims of U.S. Patent No. 6,526,981 have been sold in Colorado.

13.    In contrast, John Finamore, the Chief Executive Officer of Tapeless, visited the I.V. House office in St. Louis in March 2000 for the purpose of negotiating a joint development agreement between the parties. I.V. House had no further communications with Shesol or Tapeless after May 2000.

14.    In this case, none of the witnesses that I.V. House expects would testify (the "I.V. House Witnesses") resides in Colorado. Rather, the I.V. House Witnesses reside in Missouri. These witnesses include, but are not limited to: myself and Ms. Vallino, co-owners of I.V. House; Lisa Rene Rozier, I.V. House's sole employee; as well as Eileen Constantinou, a Nursing Practice Consultant at Barnes Hospital in Missouri, and Darnell Roth who are not employees of I.V. House. These witnesses have knowledge concerning the conception and development of the invention disclosed and claimed in the '981 Patent, and/or the communications between Shesol and I.V. House. In addition, Ms. Roth has a terminal illness that would likely prohibit her from traveling to Colorado.

15.    I.V. House's paper documents, files, machinery and all of its prototypes are located in St. Louis, Missouri. All of I.V. House's conception, design, and development activities also occurred in Missouri. These documents and activities are integral to this action as they establish

the conception and development of the invention disclosed and claimed in the '981 Patent. Further, I.V. House believes that the volume and medium of the materials to be transported to Colorado would make this case more expensive.

I hereby declare under the penalty of perjury that the foregoing is true and correct.

Dated: _3/9/2007_                         _Betty Rozier_
                                          Betty Rozier

13371675

EXHIBIT 2




This Week       Inventor Search

INVENTION
*dimension*

Inventor
OF THE Week

Inventor's
Handbook

Games &
Trivia

Links &
Resources

## Inventor of the Week Archive



**Intravenous Catheter Shield**

The mother-daughter team of Betty M. Rozier and Lisa M. Vallino, of Hazelwood, Missouri, has invented a simple device that makes it safer and easier for hospitals to provide patients with IVs.

Lisa Vallino, RN BSN, has worked for many years as an emergency room and pediatrics nurse. Like most nurses, she learned to improvise methods of treatment in the absence of standard equipment. For example, nurses commonly used to cut a plastic cup in half and then tape it for protection around the site where an IV needle enters an arm or leg; this makeshift method was clumsy and could even be dangerous.

Vallino decided to invent a better way. She designed a polyethylene site protector, shaped like a computer mouse, that is soft, smooth-edged, transparent, and attachable with a single piece of tape. The "IV House" is safer, quicker and less expensive than other methods of IV site protection. It also reduces physical and emotional trauma to patients: its security means less accidental dislodging of the IV —which means fewer painful reinsertions; while its shielding makes especially young patients less tempted themselves to worry, or worry about, the device—which means less need for restraints.

Vallino enlisted her mother, Betty Rozier, to help research, refine, patent and market the device. Since earning a patent in 1993, the duo's on-site demonstrations have convinced over 100 hospitals to make the IV House standard equipment. In addition, Vallino and especially Rozier give lectures in the St. Louis area, with a special focus on encouraging girls and young women to pursue careers in business and the sciences.

Betty Rozier and Lisa Vallino have won local and national awards for their inventiveness and entrepreneurship. Meanwhile, their IV House continues every year to benefit more health care providers and patients nationwide.

[March 1998]

EXHIBIT 3



17 August, 1999
IV House
7400 Foxmont Dr.
Hazelwood, MO. 63042

To Whom It May Concern:

I noticed your IV Site Protector in the June issue of *Patient Management* and could not help but see a synergy between one or two of my products and that product. Tapeless Technologies Inc. has a series of patented non-latex, **reusable** secondary dressing holders. Among the patented products is an IV dressing holder and an arm dressing holder. I can see your IV Site Protector bonded to the IV dressing holder so that the one unit not only protects the IV site, but also attaches without any adhesive and secures the tubing at the same time. A second scenario would be the arm dressing holder with the IV Site Protector. This would provide for the same benefits, but without a means to secure the tubing. The "window" in the holders would allow for visualization of the insertion site through your Protector without having to disrupt the site.

I am thinking that our product enhances the usability of your product and may even increase its appeal. If the idea of discussing a joint venture on this combination device is appealing to you, please feel free to either write or call me directly at (303) 699-8254.

Best of success with your product.

Sincerely,

Barry F. Shesol, M.D.
President
Tapeless Technologies, Inc.

18158 East Long Avenue   •   Aurora, Colorado 80016 USA   •   Fax 303-699-8880   •   Toll Free 888-780-3500

EXHIBIT 4

(314) 831-3683          P.02

# CONFIDENTIAL NON-DISCLOSURE AGREEMENT

This Agreement is made and entered into by and between Progressive IV's, Inc. (d/b/a I.V. House®), a corporation organized and existing under the laws of the State of Missouri, United States of America (hereinafter "PIV"), and TAPE*less* Technologies, Inc., a corporation organized and existing under the laws of the State of Colorado.

## WITNESSETH

WHEREAS, PIV owns and/or has certain rights, titles, or interests in and to certain patent applications, patent continuation applications, patent continuation-in-part applications, patent divisional applications, inventions, technical information, ideas, business plans, marketing plans, customer lists, reports, data, drawings, samples and/or related information related to its business and/or designs of intravenous site protectors (hereinafter "Proprietary Information");

WHEREAS, TAPE*less* Technologies, Inc. desires to review and inspect the Proprietary Information for the sole and limited purpose of determining whether it is interested in negotiating with PIV to purchase, obtain a license, or obtain any other interest in the Proprietary Information for the commercial development and/or development and/or exploitation of the Proprietary Information;

WHEREAS, the undersigned, Barry Shesol, MD, represents and warrants that he is authorized by TAPE*less* Technologies, Inc., to execute this Agreement on behalf of TAPE*less* Technologies, Inc., and that both he and TAPE*less* Technologies, Inc., shall be bound by the terms and conditions of this Agreement upon its execution;

WHEREAS, the parties have agreed upon the terms and conditions upon which PIV is willing to disclose the Proprietary Information to TAPE*less* Technologies, Inc., as hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter exchanged, the aforementioned representations, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is understood and agreed as follows:

1.      TAPE*less* Technologies, Inc. hereby understands, agrees and acknowledges that the Proprietary Information constitutes PIV's confidential and proprietary business information, that such Proprietary Information constitutes and embodies PIV's extremely valuable trade secrets, and that PIV has certain intellectual property rights in and to such Proprietary Information including, but not limited to, trade secrets, copyrights, trademarks, service marks, and patents.

2.      PIV shall permit TAPE*less* Technologies, Inc. to inspect and review certain portions of PIV's Proprietary Information.

Tapeless Tech CDA doc

1

(314) 831-3683          P.03

page 2.

3.     TAPE*less* Technologies, Inc. shall treat and regard any and all Proprietary Information disclosed to it by PIV, including, but not limited to, any and all information which related to the Proprietary Information, as confidential, and shall preserve, hold in confidence, and take all reasonable precautions to prevent the disclosure of the Proprietary Information to any persons, entities, firms, and/or enterprise other than to those expressly hereunder entitled to access to or receive such Proprietary Information.

4.     TAPE*less* Technologies, Inc. will only reveal or disclose any of the Proprietary Information to such of its agents, employees, officers, directors and/or patent attorneys who have a legitimate need to know such Proprietary Information, and then only for the sole purposes expressed herein, and TAPE*less* Technologies, Inc., will only reveal the Proprietary Information to any such agents, employees officers, directors and/or patent attorneys after such agents, employees, officers, directors and/or patent attorneys have been appraised of and expressly agreed to bound by the terms and conditions of this Agreement in writing.

5.     TAPE*less* Technologies, Inc. will not make any copies, facsimiles, or the like, of any of the Proprietary Information.

6.     TAPE*less* Technologies, Inc. will retain and control the custody of any and all of the Proprietary Information provided it by PIV until the Proprietary Information shall be returned to PIV pursuant to the terms of this Agreement.

7.     TAPE*less* Technologies, Inc. will immediately return any and all of the Proprietary Information to PIV and/or its attorneys, including, but not limited to, any Proprietary Information provided to TAPE*less* Technologies, Inc. by PIV, and all memoranda, notes, writings, recordings, copies, facsimiles, and/or other matter relating to the Proprietary Information, upon the earliest to occur of: the request of PIV for such return and/or upon TAPE*less* Technologies, Inc. completion of its review and evaluation of the Proprietary Information.

8.     TAPE*less* Technologies, Inc. will not disclose any Proprietary Information to any other person, entity, firm, enterprise, nor use any Proprietary Information for any purpose other than specified and permitted herein, unless expressly authorized to do so by PIV in a separate written and signed instrument.

9.     TAPE*less* Technologies, Inc. recognizes and agrees that any disclosure of any portion, no matter how small, of the Proprietary Information may cause immediate, irreparable, and/or immeasurable damages to PIV, and therefore, TAPE*less* Technologies, Inc. agrees that PIV shall be entitled to immediate injunctive relief and any and all remedies available to it under law, without proof of loss, upon TAPE*less* Technologies, Inc. breach of this Agreement.

Tapeless Tech CDA.doc                                                                    2

page 3,

Furthermore, TAPE*less* Technologies, Inc. agrees and understands that its disclosure of the Proprietary Information to any third party shall constitute (among other things) a material breach of this Agreement, misappropriation of PIV's trade secrets, and possibly copyright infringement, unfair competition, and patent infringement.

10.    TAPE*less* Technologies, Inc. agrees, recognizes and acknowledges that an important element of PIV's business success is the Proprietary Information which will be entrusted to TAPE*less* Technologies, Inc. under this Agreement. TAPE*less* Technologies, Inc. further agrees, recognizes and acknowledges that the Proprietary Information is extremely confidential, has great commercial value, and would provide any competitor of PIV with an unfair competitive advantage. Accordingly, TAPE*less* Technologies, Inc. understands and agrees that this Agreement shall not expire prior to, and shall remain enforceable hereafter, regardless of the date upon which TAPE*less* Technologies, Inc. returns the Proprietary Information to PIV and/or the outcome of any negotiations.

11.    This shall not deprive TAPE*less* Technologies, Inc. from using and/or disclosing, and the definition of Proprietary Information hereunder does not include, any information which TAPE*less* Technologies, Inc. can prove: (a) was known to the trade or public at the time of disclosure to TAPE*less* Technologies, Inc.; (b) became known to the trade or public after disclosure to TAPE*less* Technologies, Inc. through no fault of TAPE*less* Technologies, Inc.; (c) was in TAPE*less* Technologies, Inc. possession prior to disclosure to TAPE*less* Technologies, Inc.; (d) was rightfully acquired by TAPE*less* Technologies, Inc. from a third party who was lawfully in possession of the information and was under no obligation to PIV to maintain the confidentiality thereof; (e) was independently developed by TAPE*less* Technologies, Inc. without the benefit and/or use of any Proprietary Information; or (f) is disclosed under operation of law, governmental regulation, or court order, provided, TAPE*less* Technologies, Inc. first provides PIV notice of its possession and/or knowledge of any such information and uses reasonable efforts to secure the confidential protection thereof.

12.    This Agreement shall become effective and binding as of the date last signed below.

13.    This Agreement shall not be construed as and shall not create a relationship of agency, partnership, joint venture, independent contractor, and/or license between the parties.

14.    PIV and TAPE*less* Technologies, Inc., understand and agree that nothing in this Agreement shall be construed as granting and/or conveying any rights, patent rights, titles, licenses, and/or other any other interests in any of the Proprietary Information, or information related thereto, to TAPE*less* Technologies, Inc.

15.    This Agreement is binding upon TAPE*less* Technologies, Inc., its successors, assigns, patent attorneys, agents, employees, officers, and directors.

Tapeless Tech CDA.doc

3

(3¹ ⁹) 831-3683          P.05

page 4,

16.     TAPE*less* Technologies, Inc. agrees and understands that it shall be liable for any damages incurred by PIV, including attorneys' fees and legal expenses, either directly or indirectly, due to any breach of this Agreement by TAPE*less* Technologies, Inc., its employees, officers, directors, patent attorneys, agents, successors, and/or assigns.

17.     Any dispute arising under this Agreement shall be governed by the laws of the State of Missouri, U.S.A., and/or the applicable governing United States federal law, statute, regulation, and/or rule. Furthermore, TAPE*less* Technologies, Inc. hereby agrees that any actions or disputes arising under or related to this Agreement shall only be brought in a court of competent jurisdiction in the City and/or County of St. Louis, Missouri, U.S.A., and TAPE*less* Technologies, Inc. hereby consents to jurisdiction and venue in the City of County of St. Louis Missouri, U.S.A..

        WHEREFOR, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.


TAPE*less* Technologies, Inc.                    PROGRESSIVE IV's, INC.

By: _____                      By: _____
[Name]                                            [Name]
[Title] PRESIDENT                                 [Title] President

Date: 8-24-99                                     Date: 8/24/99


Tapeless Tech CDA.doc                                                           4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **Barry F. Shesol, M.D.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.  06-CV-02551-JLK-CBS** |
| | ) |
| **I.V. House, Inc., a Missouri Corporation,** | ) **Honorable John L. Kane** |
| | ) |
| **Defendant.** | ) |
| | ) |
| | ) |

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2007, a true and correct copy of the forgoing document was filed electronically via CM/ECF in the United States District Court for the District of Colorado, with notice of same being electronically served by the Court, addressed to:

> J. Mark Smith, Esq.
> Director
> Pendleton, Friedberg, Wilson & Hennessey, P.C.
> 1875 Lawrence, Tenth Floor
> Denver, CO  80202

> ___/s/ *Joseph A. Mahoney*___

13371397